# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**JOYCE M. WILLIAMS,**

    **Plaintiff,**

  v.           **Case No. 18-CV-354**

**FARMERS NEW WORLD LIFE INSURANCE COMPANY,**

    **Defendant.**

## DECISION AND ORDER

### 1. Facts and History

Tajah Williams[1] took out a $150,000 life insurance policy with Farmers New World Life Insurance Company on October 27, 2016. (ECF No. 53, ¶ 1.) Prior to the issuance of the policy and as part of a paramedical examination, Tajah gave blood and urine samples. (ECF No. 43, ¶ 2; ECF No. 53, ¶ 6.) Farmers contends it uses a "standard panel of tests" on samples and the panel does not include a test for marijuana. (ECF No. 53, ¶¶ 8, 9.) Farmers tests for marijuana only if it has some reason to do so based on information from the application materials, motor vehicle records, or other information from the Medical

---

[1] The court will refer to Tajah Williams using her first name to differentiate her from her mother, Joyce Williams, and her grandmother, Jacquelyn Williams. The court will likewise refer to Joyce Williams and Jacquelyn Williams using their first names.

Information Bureau. (*Id.*, ¶ 10.) Farmers states that it relies on applicants to truthfully answer the questions on the application (*id.*, ¶ 11), one of which is "Have you ever used, or been treated for the use of cocaine, marijuana, heroin, or any other addictive or illegal drug?" (*Id.*, ¶ 13). Tajah's application had a "no" answer to this question. (*Id.*, ¶ 13.)

Tajah was murdered two months later, on December 26, 2016. (ECF No. 45 at 2, n.1.) On December 30, 2016, Farmers received a claim under the policy. (ECF No. 43, ¶ 6.) Farmers contends that, because Tajah died within two years of the issuance of the policy, the incontestability clause was not yet applicable. (ECF No. 53, ¶ 16.) The incontestability clause states:

> We will not contest this policy after it has been in force for two years from the date of issue during the insured's lifetime except for nonpayment of premiums. This provision does not apply to any additional benefits for disability or accidental death.
>
> If this policy is reinstated, we will not contest any statements on the reinstatement application after the policy has been in force for two years from its date of reinstatement during the insured's lifetime.

(ECF No. 28-23 at 4.)

Broyles Claims Decision Support, Inc. was retained to investigate the claim. (ECF No. 43, ¶ 6; ECF No. 53, ¶ 22.) Farmers alleges that Tajah's medical records from an emergency room visit on July 11, 2016, noted "significant marijuana use (daily)." (ECF No. 53, ¶ 27). Based on this information and per its underwriting guidelines, Farmers contends that, had it known of Tajah's marijuana use, it would not have offered her coverage because she would be considered a "current" and "heavy" user of marijuana.

(*Id.*, ¶¶ 28-30, 32-33.) Accordingly, Farmers denied the claim and "[found] the policy null and void for material misrepresentations in the policy application as a result of the insured's failure to disclose her history of daily marijuana use." (*Id.*, ¶ 37.)

Joyce Williams, Tajah's mother, filed this lawsuit on December 18, 2017, in Milwaukee County Circuit Court, alleging bad faith and breach of contract on the part of Farmers and seeking payment under the policy. (*Joyce M. Williams v. Farmers New World Life Insurance Company*, Case Number 2017CV013583; ECF No. 1-1.) Farmers removed the case to this court based on diversity jurisdiction. (ECF No. 1 at 3.)

Pending before the court are five motions. Both Farmers (ECF No. 28) and Joyce (ECF No. 33) have moved for summary judgment. In support of its opposition to Joyce's motion for summary judgment, Farmers filed what it captioned a Request for Judicial Notice, seeking judicial notice of two facts, discussed below. (ECF No. 42.) Joyce has also moved to exclude testimony of Farmers' non-retained experts (Dr. Ann Lagerlund, Dr. Nadia Huq, Bonnie Ehlinger, R.N., and Susan Talaska-Pikalek, R.N.) (ECF No. 29), to disregard hearsay in the Aurora Sinai Medical Center (Aurora) records (*id.*), and "To Strike an Unnamed Expert Witness" (ECF No. 48). All parties have consented to the full jurisdiction of a magistrate judge. (ECF Nos. 5, 7.) Briefing on the motions is closed and all are ready for resolution.

## 2. Analysis

### 2.1 General Hearsay Principles

Hearsay statements are generally not admissible. Fed. R. Evid. 802. "'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." FRE 801(a). Hearsay is defined as "a statement that: the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement." FRE 801(c)(1)-(2).

But a statement "that is made for—and is reasonably pertinent to—medical diagnosis or treatment; and describes medical history; past or present symptoms or sensations; their inception; or their general cause" is excluded from the rule against hearsay. FRE 803(4). Also excluded is:

> A record of an act, event, condition, opinion, or diagnosis if:
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.

FRE 803(6).

**2.2 Joyce's Motion to Exclude Testimony of Defendant's Non-Retained Experts**

It appears that the primary (if not sole) basis for Farmers' conclusion that Tajah used marijuana daily is an entry in a medical record that allegedly records a statement Tajah gave to medical personnel during a July 2016 visit to the Emergency Department of Aurora Sinai Medical Center. Toward that end, on February 28, 2019, Farmers identified Dr. Ann Lagerlund, Dr. Nadia Huq, Bonnie Ehlinger, R.N., and Susan Talaska-Pikalek, R.N., as non-retained expert witnesses under Federal Rule of Civil Procedure 26(a)(2)(c), which does not require experts to produce reports. (ECF No. 23-1 at 6-10.) According to that disclosure, Dr. Huq was the resident doctor assigned to Tajah during her July 2016 visit, and she was supervised by Dr. Lagerlund. (*Id*. at 8.) Ehlinger was the initial nurse assigned to Tajah during her visit, and Talaska-Pikalek was the registered nurse assigned to Tajah during her visit. (*Id*. at 9-10.)

According to the disclosure by Farmers, all four witnesses are expected to testify that Tajah was admitted "with the chief complaint of abdominal pain and that in response to questions asked during her examination and treatment []advised the emergency room medical personnel, Dr. Huq and Dr. Lagerlund that she used marijuana on a daily basis." (ECF No. 23-1 at 6-9.) Each of them is also expected to testify that "information regarding a patient's history of drug use, including marijuana use, is requested as part of the examination of patients as such information may and can be relevant to the diagnosis and treatment of a patient." (*Id*.)

In addition, Dr. Huq is expected to testify that "she formulated the diagnosis of dysmenorrhea and prepared a treatment plan with Dr. Lagerlund[.]" (ECF No. 23-1 at 8.) That treatment plan "included advising Tajah M. Williams to cut back on daily cannabis use to allow for symptom ablation." (*Id*.) Dr. Lagerlund is expected to testify that she concurred with Dr. Huq's diagnosis and treatment plan. (*Id*. at 7.)

Joyce seeks an order excluding the testimony of all four witnesses. Nonetheless, her brief in support of her motion (ECF No. 30) focuses entirely on Dr. Lagerlund. Quoting from Dr. Lagerlund's deposition, Joyce points out that Dr. Lagerlund was unaware she had been named in Farmers' disclosures (*id*. at 11), does not consider herself a medical expert on marijuana (*id*. at 12), and, most importantly, has no recollection of having asked Tajah about her marijuana use (*id*. at 13). In short, Joyce argues, Dr. Lagerlund has no personal knowledge of Tajah's marijuana use. From Joyce's statement that "[w]e do not know what the other non-retained experts might state under oath" (*id*. at 16), the court surmises that she did not depose Dr. Huq, Nurse Ehlinger, or Nurse Talaska-Pikalek, which is no doubt why her brief focuses exclusively on Dr. Lagerlund.

In response to the motion, Farmers argues that Dr. Lagerlund is presented as an expert witness on, among other things, her diagnosis of Tajah's cannabis abuse. (ECF No. 38 at 22-23.) It argues that "Dr. Lagerlund does not need to be an expert in marijuana pharmacology to opine on the treatment and diagnosis of her patient." (*Id*.)

It does not appear that any of the four non-retained expert witnesses "diagnosed" Tajah's cannabis use in the sense that any of them determined through the administration of medical tests that Tajah used marijuana. The only evidence that Tajah used marijuana is an entry in a medical record that allegedly records her statement that she did—at least according to Dr. Huq's notes of her discussion with Tajah when she came to the emergency department. Under Rule 803(4) of the Federal Rules of Evidence, a statement made for, and reasonably pertinent to, medical diagnosis or treatment and which "describes medical history; past or present symptoms or sensations; their inception; or their general cause[,]" are not excluded by the rule against hearsay. Tajah's alleged statement to Dr. Huq about her daily marijuana use was "reasonably pertinent" to the diagnosis about what was causing her nausea and vomiting that led to her coming to the emergency department. As such, it is admissible under FRE 803(4). No basis exists for precluding Dr. Huq from testifying to what Tajah said to her if she can recall Tajah's statement. If Dr. Huq cannot remember, it is possible that the evidence would be admitted in other ways. It is premature at this stage to rule that any testimony from Dr. Huq about Tajah's alleged marijuana use is inadmissible.

Dr. Lagerlund and the two nurses learned about Tajah's statement from Dr. Huq. As such, none of them can testify to what Dr. Huq told them if the purpose of offering that testimony is to show that Tajah smoked marijuana. And the court can think of no

other purpose for allowing testimony from Dr. Lagerlund and the two nurses as to what Dr. Huq said to them about Tajah's marijuana use.

Although Dr. Huq's statement to Dr. Lagerlund and the nurses about what Tajah said would be hearsay if offered for the truth of the matter asserted, that does not render the rest of their proposed testimony inadmissible. For example, to the extent they are all familiar with the fact that information regarding a patient's history of drug use, including marijuana use, is requested as part of the examination of patients, that may be proper testimony. *See* FRE 406 ("Evidence of…an organization's routine practice may be admitted to prove that on a particular occasion the…organization acted in accordance with the…routine practice.").

In short, no basis exists for precluding these four witnesses from testifying at all. That is, no basis exists for precluding them from testifying as to relevant facts of which they have personal knowledge, or offering expert testimony in areas in which they have expertise—as long as it was disclosed in the expert disclosures. Thus, Joyce's motion to preclude these witnesses from testifying will be denied.

**2.3 Joyce's Motion to Disregard Hearsay in the Aurora Medical Records**

Tajah's medical records from Aurora on July 11, 2016, contain several references to marijuana use. (ECF 31-1 at 2 ("Cannabis abuse"), 8 ("Social history is significant for frequent marijuana use (daily)), 11 ("Cannabis overuse"), 12 ("should cut back on daily cannabis use as well to allow for sx ablation"), and 19-21 (information regarding

marijuana abuse)). Joyce contends that the medical records are hearsay and, thus, not admissible pursuant to either Fed. R. Evid. 803(4) or 803(6). (ECF No. 30 at 22-25.) She notes that "the alleged daily use of marijuana by Tajah Williams was obtained through and by the social history taken from Tajah Williams on July 11, 2016." (*Id.* at 23.)

Farmers contends that, not only are the records admissible under FRE 803(4) and 803(6) (ECF No. 38 at 25-31), they are also admissible under FRE 807 (*Id.* at 31-34) or are admissible non-hearsay as "[a]n out of court statement…offered to show its effect on the hearer's state of mind" (*Id.* at 34-35). "The test for determining whether the statements fall within [FRE 803(4)] is 'whether such statements are of the type reasonably pertinent to a physician in providing treatment.'" *Guzman v. Abbott Laboratories*, 59 F. Supp. 747, 755 (N.D. Ill. 1999) (quoting *Cook v. Hoppin*, 783 F.2d 684, 690 (7th Cir. 1986)). "In determining which statements are relevant to diagnosis or treatment, each case must be examined on its own facts, and in making such a judgment much will depend on the treating physician's own analysis." *Cook*, 783 F.2d at 790.

Farmers argues that "Dr. Lagerlund actually testified that Ms. Williams' statement about her daily marijuana use was part of the diagnosis and treatment plan for Ms. Williams[.]" (ECF No. 38 at 28.) Specifically, she gave the following testimony:

Q      Now, you also indicated in your note back on -- on 0304 [ECF No. 28-4 at 12] that you agreed with the assessment and plan. That was the assessment and plan of Dr. Huq?
A      Yes.
Q      And what was the assessment of Dr. Huq that you agreed with?

A    That she needed to follow up with OB if the symptoms got worse, that she should continue Zofran, if needed, for her nausea, and continue ibuprofen for her abdominal pain, and that she should cut back on marijuana use.

Q    And that's -- according to the note here, it says as well "to allow for SX ablation." What does that sentence mean?

A    To help improve -- possibly improve her symptoms. Because sometimes, if people do use marijuana regularly, they have problems with recurrent vomiting. We call it cyclical vomiting, from marijuana use. So that may help improve the symptoms because she was also coming in for vomiting.

Q    So her daily marijuana use was part of the assessment and plan for this -- for Tajah Williams?

A    The -- the -- yeah. The -- sorry. Repeat the question for me.

Q    Sure. The plan -- the diagnosis and plan for Tajah Williams included cutting back on daily cannabis use?

A    Yes.

Q    To relieve her symptoms that she presented with in the ER?

A    Yes. We weren't sure if they were related, but we thought that would not hurt, to cut back.

Q    If a patient presented in the ER and claimed daily marijuana use, would you do a lab test to check that?

A    No.

Q    And is there a reason you wouldn't?

A    It wouldn't change our management in the ER. You know, it probably depends on the complaint. So there may be a complaint that we would consider ordering it, but on a general basis, unless there's something specifically related to that, we don't find it useful.

(ECF No. 31-4 at 21-23, Tr. 21:12-23:5.)

Joyce argues that "Dr. Lagerlund has no idea if marijuana use was related in any way to the symptoms with which Tajah presented at the Aurora Emergency Room on July 11, 2016." (ECF No. 30 at 25.) She points to the following testimony from Dr. Lagerlund's deposition:

Q       In your opinion, Tajah Williams should have cut back on her daily
        cannabis use to reduce the symptoms that she presented with in the
        ER?
A       I don't know if they were necessarily causing the symptoms, but as
        marijuana can cause nausea and vomiting, we recommend
        decreasing it. But we don't know if they were related.

(ECF No. 31-4 at 25, Tr. 25:2-25:8.) Joyce also notes the differences between Tajah's visits

to the Aurora Emergency room on July 11, 2016, and on August 10, 2016. (ECF No. 30 at

14-15.) Even though Tajah's symptoms were almost identical, Joyce argues that "[a]t no

time during Tajah's visit on August 10, 2016 was there any mention of marijuana use of

any kind, let alone daily use." (*Id.* at 14.)

    The fact that at no time during Tajah's visit on August 10 visit did she discuss

marijuana use does not demonstrate that marijuana use was not "reasonably pertinent"

to the diagnosis on July 11, 2016. Nor does the fact that Dr. Lagerlund did not know

whether marijuana use was causing the nausea and vomiting for which Tajah came to the

ER. In trying to determine what was causing Tajah's nausea and vomiting, Tajah told Dr.

Huq that she used marijuana daily. As stated in *Cook*, the issue is whether her statements

were of the type reasonably pertinent to a physician in providing treatment to a patient

who is experiencing nausea and vomiting. The doctors concluded that they were, and

that cutting back on her marijuana use may help alleviate the nausea and vomiting.

    Tajah's statement about marijuana use was recorded in Aurora's medical records.

After getting information from Tajah about her reason for coming to the emergency

department (vomiting and nausea), Dr. Huq wrote in the medical record, "Social history

is significant for frequent marijuana use (daily)." (ECF No. 31-1 at 8.) Dr. Lagerlund then wrote below Dr. Huq's plan: "I supervised the resident and agree with their [sic] note. I independently obtained a history, performed an exam, reviewed pertinent results and discussed the case with the resident. I agree with assessment and plan." (ECF No. 31-1 at 12.) Dr. Lagerlund further agrees she is familiar with the regular business practices of Aurora:

> Q    And are you familiar with the fact that Aurora Sinai Medical Center maintains medical records of its patients as part of its regular business activity?
> A    Yes.
> Q    And as part of your job in the emergency department, are you regularly required to record your examination, assessment or diagnosis and treatment plan of a patient that you've treated?
> A    Yes, if it's not a patient that is already seen by a resident or PA. If they have a medical record, we do not have to put our own physical exam or whole repeat of the record. We just have to cosign their chart.
> …
> Q    Sure. It was the regular practice -- it was your regular practice in the ER to make notes, electronic notes, of an examination or a diagnosis or a treatment plan at or near the time?
> A    Yes.

(ECF No. 31-4 at 13-15, Tr. 13:22-14:10, 15:2-15:6.) Accordingly, the statement in the medical records falls under the business records exception to the hearsay rule and is admissible.

Joyce's motion to exclude hearsay statements in the Aurora medical records is denied.

**2.4 Joyce's Motion to Strike Unnamed Expert Witness**

In support of its motion for summary judgment, Farmers filed a declaration of its Underwriting Manager, Kathy Jones. (ECF No. 28-17.) In her declaration, Jones describes in some detail the process through which Farmers' underwriting department reviews requests from Farmers' claims department relating to a claim that Farmers is investigating. (*Id.*, ¶¶ 2-6.) After describing the review process generally, Jones describes her review of the claim submitted on Tajah's policy. (*Id.*, ¶¶ 7-10.) Jones states:

> It was my determination and the determination of the Underwriting Department that Ms. Williams had incorrectly answered Question B., 5 on the Life Application — Part 2 Medical History and Question A., 6 on the Medical Exam. Further, if the Underwriting Department been made aware that Ms. Williams was a current daily user of marijuana, [Farmers] would have declined to offer coverage to Ms. Williams as set forth on the Underwriting Reply.

(*Id.*, ¶ 10.)

Joyce concedes that Jones was identified as a potential fact witness in Farmers' initial disclosures on July 5, 2018. (ECF No. 49 at 1.) However, Joyce argues that Jones's declaration is actually expert testimony. (*Id.* at 2.) In response, Farmers argues that "[it] does not intend to have Ms. Jones offer expert testimony requiring scientific, technical or other specialized knowledge which would fall under the Fed. R. Evid. 702" and that "[her] testimony…is based on her personal knowledge, involvement and handling of the underwriting review." (ECF No. 58 at 5.)

FRE 602 states:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

Fed. R. Evid. 602. Jones's declaration does not include expert testimony. Rather, it includes fact testimony of the underwriting review process at Farmers and her involvement with Tajah's claim. As Farmers states, "Ms. Jones' declaration sets forth her position with [Farmers], her knowledge of the contestable claims process, the specific actions she personally undertook as part of the underwriting review of Tajah Williams' application and medical records in preparation of the underwriting reply to Claims." (ECF No. 58 at 11.)

Accordingly, Joyce's motion to strike the testimony of Jones will be denied.

## 2.5 Motions for Summary Judgment

### 2.5.1   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*,

758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

### 2.5.2 Farmers' Request for Judicial Notice

Farmers submitted a Request for Judicial Notice in support of its opposition to Joyce's motion for summary judgment. (ECF No. 42.) "The court may judicially notice a fact that is not subject to reasonable dispute because it: is generally known within the trial court's territorial jurisdiction; or can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." FRE 201(b). Farmers requests that the court take judicial notice that it is a Washington corporation. (ECF No. 42 at 1.) It also requests that the court take judicial notice of a document published by the State of Wisconsin Office of the Commissioner Insurance entitled "An Intermediary's Guide to Wisconsin Insurance Law." (*Id.*)

Farmers' citizenship is relevant in determining whether Wis. Admin. Code § 3.28(5) is applicable. *See* ECF No. 55 at 6-7; ECF No. 40 at 16. Additionally, Farmers' citizenship is relevant to the issue of subject matter jurisdiction, given that the case was removed to this court based on diversity of citizenship, 28 U.S.C. § 1332. (*See* ECF No. 1 at 1.) Because a federal court must always have subject matter jurisdiction, which cannot

be waived, the citizenship of Farmers is relevant. *See* Fed. R. Civ. Pro. 12(h)(3). Farmers' citizenship can be easily found by searching for it in The National Association of Insurance Commissioners State Based Systems database for Wisconsin. *See* ECF No. 42 at 1; ECF 42-1. Accordingly, the court takes judicial notice that Farmers is a Washington corporation.

The second request is a guide to Wisconsin Insurance Law published by the State of Wisconsin Office of the Commissioner of Insurance. The Introduction states, "This guide is written both for those who are preparing for insurance exams and for those who want to keep up to date on Wisconsin insurance law. It is a brief summary of select laws and rules and is not complete." (ECF No. 42-2 at 3.) The court finds much of the information in this guide to be irrelevant to this case, and the guide itself admits to being both "not complete" and just "a brief summary." Accordingly, the court will deny this request for judicial notice.

### 2.5.3 Summary Judgment Analysis

Both Farmers and Joyce filed motions for summary judgment. (ECF Nos. 28, 33.) Joyce argues in her motion that Farmers did not follow the required procedures for insurance contract rescission as set forth in *Pum v. Wis. Physicians Serv. Ins. Corp.*, 2007 WI App 10, 298 Wis. 2d 497, 727 N.W.2d 346, and that if any misrepresentations were made on the application Farmers cannot rely on them to support rescission. (ECF No. 34.) In its motion, Farmers argues that it had a valid basis for rescinding the contract. (ECF No. 28.)

It addresses an anticipated theory by Joyce: Tajah was not present when the application was filled out, so she did not answer the questions or authorize her signature. (*Id.* at 16-19.)[2] Farmers contends that, if that is true, "it means that there is no policy and therefore, no policy to breach." (*Id.* at 17 (footnote omitted).)

The parties each begin their arguments by discussing insurance contract rescission, specifically Wis. Stat. § 631.11. (ECF No. 28 at 12-13; ECF No. 34 at 9-11.) That statute states:

> (b) Misrepresentation or breach of affirmative warranty. No misrepresentation, and no breach of an affirmative warranty, that is made by a person other than the insurer or an agent of the insurer in the negotiation for or procurement of an insurance contract constitutes grounds for rescission of, or affects the insurer's obligations under, the policy unless, if a misrepresentation, the person knew or should have known that the representation was false, and unless any of the following applies:
>> 1. The insurer relies on the misrepresentation or affirmative warranty and the misrepresentation or affirmative warranty is either material or made with intent to deceive.
>> 2. The fact misrepresented or falsely warranted contributes to the loss.

Wis. Stat. § 631.11(b).

> To be entitled under the statute to rescind an insurance policy, the insurance company must prove: (1) that (a) a misrepresentation was made *and* (b) the person making it knew, or should have known, that it was false; *and* (2) either (a)(i) the insurer relied on the misrepresentation, and (ii) that misrepresentation was material, or (iii) it was made with intent to deceive; *or* (b) the misrepresented fact contributed to the loss.

---

[2] In its reply brief, Farmers states in a footnote that "Plaintiff's failure to supplement her Fed. R. Civ. Proc. 26(a) disclosures is a violation of Fed. R. Civ. Proc. 26(e) and is subject to sanctions as provided in Fed. R. Civ. Proc. 37(c)[.]" (ECF No. 55 at 12, n.11.) However, Farmers never asks the court to take any action on this issue. Accordingly, the court will not consider it further.

*Pum*, 2007 WI App 10, ¶ 9 (citing Wis. Stat. § 631.11(1)(b)).

In order to prevail, Farmers will need to show first that Tajah answered the question on the application about marijuana use. It will then need to show she did smoke marijuana and, therefore, made a misrepresentation on the application. Finally, it will need to show that this misrepresentation was material and would have caused it to deny coverage to Tajah.

Before determining whether Farmers had a right to rescind the contract due to a material misrepresentation, a preliminary question is whether Tajah even made a misrepresentation on the application. Jacquelyn Williams, Tajah's grandmother, gave the following testimony at her deposition:

> Q    And the first ten pages of this life application has information including medical -- responses to medical questions. Is it your testimony that Tajah Williams did not respond to those questions?
> A    Tajah was not present.
> Q    And is it your testimony that you did not provide responses to those questions?
> A    No, I did not.

(ECF No. 47-1 at 42, Tr. 42:6-42:14.)

> Q    Did Tajah Williams authorize Mr. Abraham to e-sign this application for her?
> A    She was not present. This was all done in one day.

(*Id.* at 37, Tr. 37:5-37:8.)

> Q    It asks whether -- "Have you ever used or been treated for the use of amphetamines, barbiturates, cocaine, marijuana, opiates, hallucinogens or any other illegal drugs or have you been treated by

or consulted a member of the medical profession for abuse of prescription drugs?" And the answer checked is "No."

> Who answered that question?

A     George Abraham.

(*Id.* at 44, Tr. 44:8-44:16.) Therefore, not only does Jacquelyn allege that Tajah was not present when the application was filled out, Jacquelyn testified that Tajah never authorized Abraham to e-sign the application and that Abraham, not Tajah, answered the question about marijuana use.

Abraham, however, stated that Tajah *was* present at the time he took the application:

Q     All right. So both Jacquelyn and Tajah were present at the same time when you took the application?

A     Yes.

(ECF No. 47-5 at 47, Tr. 47:11-47:14.)

Q     And it says there "Have you ever used or been treated for the use of amphetamines, barbiturates, cocaine, marijuana, opiates, hallucinogens or any other illegal drugs or have you been treated or consulted a member of the medical profession for abuse of prescription drugs?" Do you see that?

A     Yes. It's in front of me.

Q     And you indicate that the answer was no?

A     She answered no.

Q     Who is "she"?

A     Tajah. She is the primary insured.

> …

Q     And Tajah is sitting next to you?

A     Tajah, she is right beside me facing the computer. Same thing like what I describe it exactly were beside, and the question was in front of her.

Q     And I remind you that you're under oath, and I remind you that Jacquelyn says that Tajah wasn't present.

A        It's impossible. I can't be able to -- not to have all this information if the person as the insured is not there. And I don't know why she said so if she said so.…

(*Id.* at 57-58, Tr. 57:14-57:25, 58:7-58:18.)

Q        How about if -- we've been told by Jacquelyn that Tajah was in school when you met with Jacquelyn to fill out the application?

A        There is no way you can see someone or you can write someone without seeing him or her. At the time of the application, the insured has to be in front of me because she is an adult person, and she can actually fill it by herself all this information. She is not a minor, and she have to fill all this information while she is in front of me. I can't be able to write any application without the insured in front of me.

(*Id.* at 76, 76:13-76:24.) With regard to the e-signature, Abraham testified:

Q        And you're sure Tajah was with Jacquelyn when she signed the -- when the application was signed?

A        At this time I couldn't remember if she was or was out because I was just simply having the requirement it has to be done with the owner's signature as you see in the receipt, but this is -- for sure it was Jacquelyn, but I couldn't remember at this meeting in 2016 when I delivered the policy she was there or not.

(*Id.* at 50-51, Tr. 50:24-51:8.)

A genuine dispute exists as to whether Tajah answered the question on the application regarding marijuana use or whether Abraham did. That genuine dispute is material. If Tajah did not answer the question, then she did not make any material misrepresentations on the application. However, if she did answer the question, then the question is whether the misrepresentation was material and whether it gave Farmers the right to rescind the insurance policy. Because there is a genuine dispute as to who

answered the question regarding marijuana use on the application, Farmers is not entitled to summary judgment.

Joyce contends that, even if a misrepresentation was made, she is still entitled to summary judgment because Farmers did not act reasonably. Joyce argues that, "assuming but in no way conceding that a misrepresentation was made, [Farmers] is barred from relying on any such misrepresentation as grounds for rescission because…[Farmers] failed to follow the edict in Wis. Admin. Code Ins. §3.28(5)…." (ECF No. 34 at 13.) "Wisconsin Admin. Code[] § 3.28(5)(c) limits an insurance company's ability to void coverage on the basis of misrepresentation if it has not duly considered material which it would have obtained through reasonable inquiry based upon the information in the application." *Pum*, 2007 WI App 10, ¶ 18 (footnote omitted). Joyce argues that Farmers should have obtained Tajah's medical records before issuing the policy and should have tested her blood and urine for marijuana and other similar drugs. (ECF No. 34 at 15-16.) Joyce alleges Farmers' failure to do so was unreasonable. (*Id.*)

Farmers contends that Wisconsin Administrative Code § 3.28(5) does not apply to this policy "because the policy at issue is a term life insurance policy that does not fall within any of the enumerated sections to which Wis. Admin. Code section 3.28 applies." (ECF No. 40 at 14-17.) Therefore, Farmers contends, Joyce's argument about not acting reasonably is irrelevant. (*Id.* at 17-20.) Moreover, Farmers argues, "[t]here is no state mandated requirement that [it] perform certain lab tests and/or review certain medical

records before issuing a life insurance policy or else they forfeit the right to void the life insurance policy for material misrepresentations." (*Id.* at 18.)

Because the policy at issue is a life insurance policy and not a type of policy to which § 3.28 applies,[3] any argument that Farmers did not act reasonably pursuant to § 3.28(5) is irrelevant.

Accordingly, both parties' motions for summary judgment are denied.

**IT IS THEREFORE ORDERED** that Joyce Williams's "Motion to Exclude Testimony of Defendant's Non-Retained Experts" (ECF No. 29) is **denied.**

**IT IS FURTHER ORDERED** that Joyce Williams's "Motion to Disregard Hearsay in the Aurora Medical Records" (ECF No. 29) is **denied.**

**IT IS FURTHER ORDERED** that Joyce Williams's "Motion to Strike An Unnamed Expert Witness" (ECF No. 48) is **denied.**

**IT IS FURTHER ORDERED** that Joyce Williams's Motion for Summary Judgment (ECF No. 33) is **denied.**

**IT IS FURTHER ORDERED** that Farmers' Motion for Summary Judgment (ECF No. 28) is **denied.**

---

[3] "Scope. This rule applies to the solicitation, underwriting and administration of any insurance issued by any insurer or fraternal benefit society under s. Ins 6.75(1)(c) [Disability Insurance] or (2)(c) [Disability Insurance] and ss. 600.03(22) [Franchise Insurance] and 632.93, Stats. [Fraternal Contract], except credit accident and sickness insurance under s. Ins 6.75(1)(c)1. or 2(c)1., and to any contract, other than one issued on a group or group type basis as defined in s. Ins 6.51(3), issued by a plan subject to ch. 613, Stats.…" Wis. Admin. Code § 3.28(2). Chapter 613 applies only to corporations incorporated under the laws of this state and, as noted above, Farmers is a Washington corporation.

**IT IS FURTHER ORDERED** the Farmers' Request for Judicial Notice (ECF No. 42) is **granted in part and denied in part**.

Dated at Milwaukee, Wisconsin this 7th day of October, 2019.

WILLIAM E. DUFFIN
U.S. Magistrate Judge